## VIM SECURITIES CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### No. 70.

Circuit Court of Appeals, Second Circuit.
July 21, 1942.

---

Llewellyn A. Luce, of Washington, D. C., for petitioner, Vim Securities Corporation.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Lewis Monarch and Bernard Chertcoff, Sp. Assts. to Atty. Gen., for respondent, Commissioner of Internal Revenue.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

Two questions are raised by the taxpayer, Vim Securities Corporation, in its petition to review the determination of the Board of Tax Appeals adjudging a deficiency in income and excess profits taxes for 1936:

(1) Whether gain realized by the taxpayer as a result of receiving an award for the condemnation of its property was subject to the provisions of Section 112 (f) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Code, § 112 (f), excepting gain from recognition where an award is expended in the acquisition of other property similar or related in service or use to the property condemned, or in the acquisition of control of a corporation owning such other property.

(2) Whether the taxpayer was engaged in business during the year 1936 within the meaning of the tax on excess profits.

Prior to June 28, 1935, Vim Securities owned a warehouse at 16 Concord Street, Brooklyn. The City of New York brought a condemnation proceeding to acquire title to the property. Title passed to the City on June 28, 1935, and under final decree of the New York Supreme Court, dated July 14, 1936, the award was fixed at $85,000 and interest and became payable on that date. The stock of Vim Securities was owned by four brothers named Kassover in equal proportions.

Prior to June 28, 1935, Vim Electric, a corporation whose stock, like that of Vim Securities, was shared equally by the four Kassover brothers, occupied 16 Concord Street as tenant of Vim Securities, and after the condemnation continued to occupy them until the latter part of December, 1935, under a temporary arrangement with the city. Thereafter it moved to 325-27 Gold Street, Brooklyn, which it has since occupied, paying rent therefor to Gold Street Corporation, the formation of which we shall speak of later.

After the condemnation, and on August 19, 1935, one of the Kassovers made a contract with the Dime Savings Bank of Brooklyn to purchase 325-27 Gold Street for $110,000, of which $10,000 was to be paid on the execution of the contract, and $100,000 on the delivery of the deed in October. His purpose was to obtain a new warehouse in place of the one condemned. On October 4, 1935, Kassover assigned this contract to Gold Street Cor-

poration, which had been organized by the Kassover brothers on October 1, 1935, in order to take title to the Gold Street premises. The stock of the corporation, like that of the other two companies, seems to have been owned by the Kassover brothers in equal shares. Its income tax return listed them as each owning $12\frac{1}{2}$ shares and as its sole stockholders.

The initial payment of $10,000 required under the contract to purchase 325-27 Gold Street was made by checks of Vim Securities for $2,000 and of Vim Electric for $8,000. The payment of the balance of $100,000 necessary to complete the purchase was made on October 5, 1935, by the personal check of one of the Kassovers for $100,000, which was derived from deposits in his bank account of three checks of Vim Electric (drawn for the purpose) of which, as we have said, the four Kassovers were the sole stockholders. On November 27, 1935, Vim Securities, which had originally advanced $2,000 toward the purchase, delivered its check for $8,000 to Vim Electric in order to refund the latter's past contribution of $8,000. On January 29, 1936, Vim Securities made a further payment to Vim Electric of $5,000. On October 9, 1936, the City of New York paid the award of $85,000 and interest. This was done by paying off a mortgage of $12,000 on 16 Concord Street and by paying the balance of $79,604.08 to Vim Securities whose property had been condemned. Vim Securities thereafter made further reimbursement to Vim Electric for the advances, made by the latter to purchase the Gold Street property, by drawing its checks to Vim Electric between January and June, 1937, inclusive, for various sums aggregating $85,000, and by making a final payment of $10,000 on July 12, 1937.

The books of Vim Securities charged Vim Electric both with the $2,000 payment that Vim Securities had made to the Dime Savings Bank toward the $10,000 deposit for the purchase of 325-27 Gold Street and with the $8,000 originally paid by Vim Electric and later refunded to it by Securities.

The books of Vim Electric carried its payments to purchase Gold Street as an account receivable from Gold Street Corporation, and the latter carried them as an account payable to Vim Electric. It may be inferred that when Vim Securities reimbursed Vim Electric for the payments to purchase Gold Street, it thereby acquired the account receivable due Vim Electric from the Gold Street Corporation and became the creditor of the latter in the amount of $110,000. Gold Street Corporation carried debit and credit items of $5,500 on its books, designated as "interest Vim Electric Co., Inc.," and apparently representing interest accrued on Vim Electric's advances up to the time Vim Electric Company was reimbursed by Vim Securities. The books of Gold Street Corporation also carried the items "Real Estate, Taxes, Insurance, Interest on Mtges., Taxes, Depreciation," all representing expenses of the Gold Street Corporation.

Upon the foregoing record the Board of Tax Appeals found that the Gold Street property was acquired by the Gold Street Corporation and not by Vim Securities, that the three corporations were and remained separate entities, and that the award received by Vim Securities was neither expended in the acquisition of property similar or related in service or use to the property condemned, nor in acquisition of control of a corporation owning such other property. Consequently, the Board concluded that the gain realized from the award paid Vim Securities was not exempt from taxation by reason of the provisions of Section 112 (f) of the Revenue Act of 1936.

The Gold Street property was acquired for a use similar to that of the Concord Street warehouse, which had been owned by Vim Securities prior to condemnation. But it was acquired by Gold Street Corporation from the Dime Savings Bank and not by Vim Securities. Nor can it be said that Vim Securities acquired "control" of Gold Street Corporation, for it never owned the latter's stock, all of which belonged to the four Kassovers. At most it only became a large creditor by acquiring the claim of Vim Electric through reimbursement of the latter. As the Board said in its opinion, the book entries of all three corporations engaged in the Kassover enterprises negative the claim that Vim Securities Corporation was to acquire the property or the control of Gold Street Corporation. The very purpose of the organization of Gold Street Corporation was to acquire the Gold Street property in order that the amount of the award to be made to Vim Securities might not be affected by disclosure, through a conveyance of 325-27 Gold Street to Vim

Securities, that the Kassover interests were acquiring a more valuable parcel of real estate for less than the amount of $135,000 which Vim Securities was claiming for its old Concord Street warehouse.

The decision in Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L. Ed. 406, indicates that a taxpayer may not carry on his business through a corporation and at the same time treat it as a mere shadow and disregard its existence whenever recognition will increase tax liability. The Gold Street Corporation was set up by the Kassovers, took title to the warehouse property and leased it to Vim Electric. It made its own income tax returns; according to its books it incurred large obligations to Vim Electric in acquiring the new warehouse, and was not a subsidiary of the latter but was, at different times, a debtor of both Vim Electric and Vim Securities. Its corporate existence cannot be disregarded and the Gold Street property conveyed to it cannot be treated as acquired by Vim Securities.

But even if it be assumed that the various intercorporate transactions we have mentioned were illusory (see United States v. Brager Building & Land Corporation, 4 Cir., 124 F.2d 349, 351), and that Gold Street Corporation was a sham or a mere passive trustee for Vim Securities, still the latter cannot be said to have complied with Section 112 (f) of the Revenue Act of 1936, for it did not "forthwith" expend its award in the acquisition either of the Gold Street property or of the control of Gold Street Corporation. While it received payment of the award on October 9, 1936, it did not until January 29, 1937, begin to make payments which by any theory could be regarded as derived from the proceeds of 16 Concord Street, and it distributed the payments over a period of five months instead of making them at once. In the meantime, so far as appears, it retained the proceeds of the award and may for all that we can know have used them for general business purposes. It certainly did not comply with the Regulation providing that a taxpayer who seeks to come within the exception of Section 112 (f) "must trace the proceeds of the award into the payments for the property so purchased" and "must be able to prove that the proceeds were actually invested in such other property similar or related in use to the property condemned." Treasury Regulations 94, Art. 112 (f)-1.

The contention of the petitioner that because it was not doing business in 1936 the Board improperly held it subject to an excess profits tax for that year cannot be sustained. The record shows that during 1936 it received the award, made large payments to Vim Electric, described itself in its income tax return as "owners and operators: real estate," stated the nature of its business as "real estate, realty holding, real estate agents," and paid out upwards of $2000 for attorneys' and professional fees. The taxpayer had the burden of overcoming the Commissioner's determination that it was engaged in doing business. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212. In such circumstances we cannot say that the Board abused its discretion when it refused to open an issue, tendered at the eleventh hour, which had not been raised in the taxpayer's petition and sustained objections to a question by counsel for the taxpayer aimed at showing that the latter had not engaged in business activities during the year 1936.

Order affirmed.